## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *EX REL.* VICTOR L. SEREBRUANY | ) ) ) | |
| -and- | ) ) | **FILED UNDER SEAL** |
| VICTOR L. SEREBRUANY C/o Silverman, Thompson, Slutkin & White 201 N. Charles St., 26th Floor Baltimore, MD 21201, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. |
| ASTRAZENACA PLC INSERT RESIDENT AGENT IN D.C. | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

## COMPLAINT

Defendant AstraZeneca submitted false and fraudulent data to the United States Food and Drug Administration (FDA) in a New Drug Application for the drug compound ticagrelor, marketed under the brand name Brilinta.   Relying on AstraZeneca's false and fraudulent data from the ONSET/OFFSET study and the Platelet Inhibition and Patient Outcomes (PLATO) clinical trial, the FDA approved ticagrelor/Brilinta to reduce heart attacks and death in patients with Acute Coronary Syndrome.   Because it obtained FDA approval for ticagrelor/Brilinta with false and fraudulent data, AstraZeneca knowingly caused the submission of false claims to the United States for reimbursement of ticagrelor/Brilinta prescriptions under various federal programs, including Medicare Part D, Medicaid, and various health plans for current and former military personnel and other categories of government employees.   The FDA would not have approved ticagrelor/Brilinta

if it had known that AstraZeneca submitted false and fraudulent data; thus, every claim submitted to the United States for reimbursement of ticagrelor/Brilinta prescriptions is false and has caused damages to the United States.

## PARTIES

1.      Victor Serebruany is an M.D./PhD and the owner of Heart*Drug*™ Research LLC (Wilmington, DE) with its laboratory and office located in Towson, MD. Dr. Serebruany is an Adjunct Assistant Professor of Medicine at Johns Hopkins University, and the Editor-in-Chief of the *World Journal of Cardiology.* He also serves as an Editorial Board member for *Cardiology, Postgraduate Medical Journal,* and *Clinical and Fundamental Pharmacology.* Over the last 20 years he has published over 250 research articles in top peer-reviewed journals, and 5 book chapters in Cardiology Textbooks. Dr. Serebruany is an inventor, currently holding 5 US patents and 4 pending applications sold to the pharmaceutical industry, or developed by Heart*Drug*™. Dr. Serebruany is internationally known as an expert in cardiovascular pharmacology, specifically in the area of antiplatelet drugs. Since 1992, Dr. Serebruany has been at the forefront of research into novel antiplatelet agents. He has conducted over 60 major research studies funded by pharmaceutical companies involving platelets and antiplatelet agents. These companies include Glaxo Smith Kline, Sanofi-Aventis, Boehringer-Ingelheim, Merck, Bayer, Lundbeck, Lilly, Bristol-Myers Squibb, AtheroGenics and Novartis. In 2007, he served as a consultant to AstraZeneca on two occasions regarding antiplatelet therapy and has lectured to AstraZeneca personnel concerning the myths and realities of antiplatelet drugs. Dr. Serebruany is also the owner of the pending patent application (US12,908,255) for Brilinta, the AstraZeneca drug which was approved by the FDA in July of 2011.

2.      Since 2008, officials at the FDA have consulted with Dr. Serebruany regarding the development of antiplatelet agents and to help the agency assess clinical trials of antiplatelet drugs. He has also participated in numerous FDA-sponsored round table discussions between FDA officials and industry representatives debating the future of antiplatelet therapy.

3.      Defendant AstraZeneca PLC is a worldwide biopharmaceutical company that reported over $33 billion in revenue for its 2011 fiscal year.  AstraZeneca trades publicly on the New York, London, and Stockholm exchanges under the symbol AZN.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this lawsuit under 28 USC § 1331, 28 U.S.C. 1345, and 31 U.S.C. 3732(a).

5.      This Court has personal jurisdiction over AstraZeneca under 31 U.S.C. §3732(a) because AstraZeneca transacted business in this District by marketing and selling its products in this District.

6.      Venue in this District is proper under 28 U.S.C. 1391(c) and 31 U.S.C. 3732(a).

## FACTUAL ALLEGATIONS

### ACUTE CORONARY SYNDROME

7.      Acute Coronary Syndrome ("ACS") is a general term for a group of symptoms related to obstruction of coronary arteries that supply blood to the heart, often associated with heart attacks, or Myocardial Infarctions ("MIs").  ACS is a life-threatening condition because of its potential for causing necrosis, or cell death, in the heart muscle.  Coronary artery obstructions result from stenosis (narrowing of the arteries from various causes, including build up of cholesterol-related plaques) and/or clot formation (thrombosis) within the artery.  Treatment for ACS includes emergency procedures to remove or reduce blockages in the arteries, either through

therapeutic/surgical procedures or by the use of drugs that reduce platelet formation (the cause of blood clots). Physical treatments for ACS include percutaneous coronary intervention ("PCI"), sometimes called angioplasty, which involves inserting a thin plastic tube as a guidewire through the patient's femoral or brachial artery and using stents or other techniques to open up a blocked artery. Interventional cardiologists generally perform PCI. The availability of facilities to perform PCI procedures is less in rural or remote locations of the United States. PCI is sometimes significantly less available in other areas of the world. Platelet-inhibiting drugs are generally believed to be beneficial in conjunction with PCI procedures, because they help prevent platelet aggregation, including clots at the site of PCI stents (stent thrombosis).

8. For patients with more serious blockages, coronary artery bypass graft surgery (CABG) may be required. Because of the risks of serious bleeding in CABG surgeries, surgeons often avoid or terminate the use of platelet-inhibiting drugs until after CABG surgery is successful.

9. Patients reporting symptoms associated with ACS require emergency medical attention. Treating physicians prefer to gather diagnostic information through EKGs, blood tests, and other tests used to determine the number and severity of coronary artery blockages before deciding whether to perform PCIs or CABG surgeries. Generally, treatment begins by giving patients platelet-inhibiting drugs before decisions about PCI or CABG can be made. Sometimes surgeons may delay CABG surgery until after any anti-platelet drugs previously administered to the patient have worn off.

10. ACS patients are generally diagnosed as STEMI (ST elevation on EKG testing with myocardial infarctions); non-STEMI (no ST elevation on EKG with myocardial infarction); or having unstable angina. STEMI patients generally have the worst prognosis.

11.     Platelet-inhibiting drugs have prophylactic benefits for patients at risk of ACS, MIs, or strokes, and have continued benefits to patients after they survive initial treatment for ACS. Platelet-inhibiting drugs may prevent the formation of new clots that would otherwise block coronary or other arteries, and also may prevent blood clots forming at stent locations (stent thrombosis).

12.     Aspirin is a drug long-recognized to have anti-platelet effects. For decades, physicians have suggested an "aspirin a day" as a prophylactic treatment for patients at risk of strokes or heart attacks, and have administered aspirin on an emergency basis for patients with symptoms of ACS, strokes, or other conditions associated with dangerous clots.

### PLAVIX BECOMES THE LEADING PLATELET-INHIBITING THERAPY

13.     In 1997, the FDA approved the drug compound clopidogrel as a platelet-inhibiting therapy. Bristol-Myers Squibb and Sanofi jointly market clopidogrel under the brand name Plavix. Between 1998-2000, Bristol-Myers Squibb sponsored the Clopidogrel in Unstable Angina to Prevent Recurrent Events (CURE) clinical trial, a double-blind study comparing clopidogrel with placebo in over 12,000 ACS patients. CURE demonstrated that clopidogrel had a clinical benefit for ACS patients. As a result, Plavix became the first-line therapy for inhibiting platelet activity in ACS patients (in conjunction with aspirin).

14.     However, Plavix has certain clinical drawbacks. The drug does not provide sufficient platelet inhibition in approximately 10-30% of patients. Moreover, Plavix can take three to four hours to begin to work. Plavix also adheres to platelets throughout the life of the cells, resulting in lingering platelet inhibition even after a patient stops taking Plavix, potentially delaying heart surgery. Even with its clinical drawbacks, Plavix was an extraordinarily profitable

drug, partly because of the lack of a clearly preferable alternative.  Bristol-Myers Squibb and Sanofi could charge brand-name prices for Plavix as a result of the drug's patent protection.

## THE PRASUGREL TRITON TRIAL

15.     Tempted by the huge market potential for more effective cardiovascular drugs, other drug companies funded research to develop platelet-inhibiting drugs that might work better than Plavix.  In the early 2000s, Daiichi Sankyo and Eli Lilly combined to develop a new platelet-inhibiting drug, prasugrel.  Prasugrel worked through a similar biological mechanism, and in preliminary studies appeared to work more quickly, and in more patients, than Plavix did.  Between November 2004 and January 2007, Sankyo and Lilly sponsored the Trial to Assess Improvement in Therapeutic Outcomes by Optimizing Platelet Inhibition with Prasugrel-Thrombolysis in Myocardial Infarction (TRITON-TIMI) 38, enrolling over 13,000 patients in a double-blinded comparison of outcomes between prasugrel and Plavix in ACS patients scheduled for PCI.

16.     Consistent with the preliminary studies suggesting that prasugrel worked more quickly than Plavix, the TRITON study showed a statistically significant reduction in death, MIs, and strokes in the period immediately after initial treatment in patients receiving prasugrel compared to patients received Plavix.  That benefit leveled off over time.  Based on the positive results from the TRITON trial, Sankyo and Lilly won FDA-approval for prasugrel, marketed under the brand name Effient.  Unfortunately, TRITON also showed that Effient caused significantly more frequent bleeding events than Plavix.  Over time data developed indicating that Effient appeared to increase the incidence of some solid cancers.  Effient did not replace Plavix as the market leader for platelet inhibition.

## ASTRAZENECA DEVELOPS TICAGRELOR

17.     In the early 2000s, AstraZeneca began clinical tests of another experimental drug compound, ticagrelor that inhibited platelet activity through a different biological mechanism than Plavix.  Based on bench-top studies of platelet inhibition, and based on pharmacokinetic studies measuring the correlation between administration of ticagrelor in healthy volunteers and levels of ticagrelor's active ingredient in their blood, AstraZeneca believed that ticagrelor had several potential advantages over Plavix.  The bench-top and pharmacokinetic studies apparently indicated that ticagrelor inhibited platelet activity much faster than Plavix, suggesting that ticagrelor should produce earlier clinical benefits than Plavix, as prasugrel/Effient had done.  AstraZeneca also believed that Ticagrelor's effects were "reversible," because ticagrelor did not adhere to platelets throughout their cell lives, and that ticagrelor should therefore have faster offset, with a resulting clinical advantage during heart surgery.

18.     However, ticagrelor also had some disadvantages.  In early studies, patients receiving ticagrelor experienced more dyspnea, or shortness of breath, had more episodes of heart ventricular pauses, and had more serious bleeding events.

19.     Ticagrelor also faced a potential pricing disadvantage.  Plavix's patent was due to expire in May, 2012.  Once that patent protection expired, generic drug manufacturers would begin marketing clopidogrel.  Generic drug manufacturers would price clopidogrel at a fraction of the name brand pricing for Plavix, causing third party payers and practitioners to prefer Plavix over newer, more expensive brand name drugs.

20.     Generic versions of Plavix also would result in enormous savings for the United States government.  The United States reimburses patients for the costs of prescription drugs

under various government programs, including Medicare Part D, Medicaid, and various health

plans for current and former military personnel and other categories of government employees.

21.     In sum, with ticagrelor's worse side effect profile, and with generic equivalents of

Plavix soon to become available, AstraZeneca needed ticagrelor to show significant  clinical

advantages over Plavix in order to obtain FDA approval and successfully market the new drug.

**ASTRAZENECA SPONSORS THE ONSET/OFFSET**
**AND PLATO STUDIES**

22.     Between 2006 and 2008, AstraZeneca sponsored the Platelet Inhibition and Patient

Outcomes (PLATO) clinical trial to compare the clinical efficacy of ticagrelor and Plavix.

PLATO was a Phase III study designed to support FDA approval for ticagrelor.  PLATO

eventually enrolled 18,624 patients in 862 study centers in 43 countries.  The trial randomly

assigned urgent-care ACS patients for treatment with either Plavix or ticagrelor.  AstraZeneca

reported PLATO's results to the FDA and in a *New England Journal of Medicine* Article

published in September 2009, trumpeting statistically significant improved outcomes for patients

receiving ticagrelor compared to Plavix.

23.     During roughly the same period of time, AstraZeneca sponsored an

ONSET/OFFSET study conducted by Paul A. Gurbel, M.D. and other researchers.

ONSET/OFFSET purported to measure platelet inhibition in blood samples taken serially over

time from patients who had stable coronary disease, and who randomly received either Plavix or

ticagrelor.  AstraZeneca submitted the ONSET/OFFSET study data to the FDA as part of its New

Drug Application (NDA) to market ticagrelor.  The ONSET/OFFSET study reported that

ticagrelor inhibited platelet aggregation faster than Plavix, and stopped inhibiting platelet

aggregation sooner than Plavix after patients stopped taking the drugs.

24.     Because of his personal experience and expertise in platelet-inhibiting compounds and their use in treating ACS patients, Dr. Serebruany became increasingly disturbed as he studied the data from PLATO and ONSET/OFFSET. Dr. Serebruany has concluded that it is more likely than not that both studies involved fabricated results.

## THE PLATO AND ONSET/OFFSET STUDIES
## ARE DRAMATICALLY INCONSISTENT

25.     Dr. Serebruany noted that PLATO and ONSET/OFFSET are dramatically inconsistent. Curiously, close analysis of the PLATO data showed that in the first few months of treatment, ticagrelor did not provide a significant early clinical advantage over Plavix. Instead, due to very high numbers of fatalities and MIs for patients in the Plavix arm beginning three-six months after initial treatment, ticagrelor had an unusual, delayed clinical benefit in comparison to Plavix. PLATO's claimed unusual benefit in a frame between 3 and 6 months after initial treatment, without a significant early benefit, contradicted ONSET/OFFSET, which found that ticagrelor inhibited platelet aggregation earlier and stronger than Plavix. PLATO's lack of early clinical benefit, and claimed late benefit, also directly contradicted the TRITON study for prasugrel/Effient. Like ticagrelor, prasugrel/Effient supposedly inhibited platelet formation earlier and more potently. Consistent with the pharmacokinetics, TRITON showed a corresponding early clinical benefit compared to Plavix in the period immediately after treatment, but no later comparative benefit. PLATO's late benefit was the exact opposite.

## PLATO'S MORTALITY RATE FOR PLAVIX WAS DISTURBINGLY HIGH
## IN OVERSEAS SITES WITHOUT INDEPENDENT CLINICAL OVERSIGHT

26.     Dr. Serebruany also noted that PLATO's mortality figures for patients receiving Plavix were extraordinarily high. PLATO reported all-cause mortality for patients in the Plavix arm at 5.9%, with vascular deaths at 5.1%. PLATO's all-cause mortality for the Plavix arm

almost doubled the all-cause mortality for the Plavix arm in TRITON, which was 3.2%. Dr.

Serebruany has done a detailed statistical analysis of mortality rates in major ACS clinical trials

over the last 15 years, and has concluded that based on the characteristics of the PLATO patient

population and the more aggressive medical treatments they received before and during the

PLATO trial, PLATO's 5.9% all-cause mortality rate for the Plavix arm is an outlier.

27.     Dr. Serebruany's chart comparing key data from past ACS trials is attached as the

last page of this Complaint. The trials had different length of patient follow-up, necessitating the

comparison of mortality percentages prorated monthly over the duration of the study reflected in

Table 2 of Dr. Serebruany's chart.   The only trial that came anywhere close to PLATO's monthly

pro-rated all-cause mortality was the CURE trial, conducted in the late '90s in a much sicker

population. CURE patients smoked much more, had five times more chronic renal disease, had

2.5 times more CABG surgeries, and far fewer CURE patients had received the benefits of

modern aggressive treatments with Plavix and statins prior to the study. By contrast, in more

recent studies where the patients more closely matched the PLATO population, all-cause monthly

pro-rated mortality in the Plavix treatment arms was half or less than all-cause PLATO Plavix

mortality.

28.     Closer analysis of the Plavix arm mortality data showed disturbing discrepancies.

As is typical for major clinical studies, AstraZeneca worked with academic researchers to design

and implement the PLATO study. Those academic researchers supervised conduct of the study.

The academic researchers and AstraZeneca recruited clinicians around the world treating ACS

patients to enroll ACS patients in the study and randomize those patients to the ticagrelor and

Plavix treatment arms. PLATO ultimately recruited 18,624 patients in 862 study sites in 43

countries. It is typical, although not required, for pharmaceutical companies sponsoring major

clinical studies to hire independent third party clinical research organizations (CROs) to monitor study sites. AstraZeneca hired independent CROs to monitor sites in the United States and former U.S.S.R. states Russia and Georgia. But AstraZeneca monitored most non-U.S. sites itself.

29.     For the 1,413 U.S. patients, 678 Russian patients, and 519 patients in Georgia, at sites monitored by independent CROs, all-cause mortality for patients in the Plavix arm was well below 4%, and Plavix actually outperformed ticagrelor. By contrast, the 1,267 patients in Hungary and 2,666 patients in Poland at sites monitored by AstraZeneca accounted for 21% of patients enrolled in PLATO, but yielded 46% of all endpoint adverse events in the Plavix treatment arm.

30.     PLATO's study design tried to "blind" clinicians treating patients at the study sites by making the form of the drugs administered look identical. AstraZeneca provided ticagrelor study drug in capsule form. AstraZeneca cut Plavix tablets in half and inserted them into capsules that looked identical to the ticagrelor capsules. However, the differences between a normally filled capsule and a capsule containing a tablet cut in half was easy to detect by opening a capsule, or even by feel. AstraZeneca had access to unblinded data. Dr. Serebruany also discovered in his investigation that AstraZeneca officials had, among other things, removed PLATO patient case report files from a hospital in Poland, and removed Clinical Research Forms and case report files from at least two PLATO sites in the Ukraine.

31.     The increase in all-cause mortality in the Plavix treatment arm at sites monitored by AstraZeneca occurred beginning three-six months after initial treatment. More deaths in the Plavix arm after three-six months contradicted the pharmacokinetic data suggesting that ticagrelor worked faster and better than Plavix. But the late benefit coincided with the period of time when it would be easiest to "fudge" data. Three to six months after initial treatment, patients are no

longer in the hospital. Patients lost to follow up can be reported dead in that timeframe without the need for further active medical records.

## CONCERNS ABOUT DATA ADJUDICATION IN PLATO

32.     PLATO did not measure death as the only unfavorable clinical outcome. PLATO's pre-determined clinical endpoints for comparing efficacy of ticagrelor and Plavix were vascular death, MIs, and strokes. MIs and strokes require medical records documenting those events. PLATO did not demonstrate any statistically significant difference in the incidence of strokes between the ticagrelor and Plavix arms. Site-reported MIs for both the ticagrelor and Plavix arms were not significantly different (504 MIS for ticagrelor, 548 for Plavix). However, as is typical in large clinical studies, AstraZeneca provided a mechanism for "adjudicating" cases to determine if they fit study criteria for adverse events. AstraZeneca hired Duke Clinical Research Institute (DCRI) as a sub-contractor to perform, among other things, central adjudication of clinical outcome events. DCRI reviewed data and confirmed or disallowed certain events reported by trial sites in the study.

33.     DCRI confirmed all 504 MIs reported at the sites for ticagrelor. However, DCRI adjudicated an additional 45 MIs in the Plavix arm beyond the 548 reported by the study sites. AstraZeneca helped determine which additional cases would be submitted for adjudication, and AstraZeneca also had access to unblinded data. In other words, by a bizarre, one-sided coincidence, the process of submitting additional patients for "adjudication" of MIs resulted in 45 more MIs in the Plavix arm, and precisely zero additional MIs for AstraZeneca's drug ticagrelor. And by further bizarre and one-sided statistical coincidence, the extra 45 MIs adjudicated by

Duke made the difference in the numbers of MIs between ticagrelor and Plavix statistically significant.[1]

34.     While the adjudication process raised significant issues about the integrity of the selection process for submitting cases to adjudication, the MI data in itself contradicts PLATO's high mortality rates in the Plavix arm.  Even with adjudication, the MI rate in the Plavix arm was 6.9%, generally consistent with the range of MI incidence in other large ACS trials.  It makes no sense that PLATO would report such a high incidence of vascular death in the Plavix arm (5.1%) without a corresponding higher rate of MIs (a predominant cause of vascular death).

**CONCERNS ABOUT DATA INTEGRITY
IN THE ONSET/OFFSET STUDY**

35.     Dr. Serebruany's scrutiny of the ONSET/OFFSET data also raised major issues of data integrity.  There are several recognized methods to test platelet aggregation.  Because of his expertise with platelet therapies, Dr. Serebruany has particular knowledge of the equipment and expenses involved in testing for platelet aggregation.  The tests require blood samples to be drawn from patients.  Platelets do not survive freezing or long transportation, so testing equipment must be available at the site to promptly test blood samples when drawn within one hour.  The article publishing the ONSET/OFFSET study claimed that the study had used three different testing methods: (1) light-transmittance aggregometry performed with a Chrono-Log Optical Aggregometer; (2) VerifyNow P2Y12 Assay; and (3) Vasodilator-stimulated Phosphoprotein Phosphorylation Assay and Glycoperotein IIb/IIIa and P-Selectin Expression, measured with a flow cytometer.  The equipment and supplies necessary to perform the tests are expensive.  Dr. Serebruany has direct, personal knowledge that the equipment and supplies necessary to perform

---

[1] Dr. Serebruany does not accuse the Duke adjudicators of being biased; the Duke adjudicators only saw the cases that AstraZeneca sent them.

these tests on 10 ONSET/OFFSET patients at any one site would cost between approximately

$24,000 at a minimum (assuming the lab purchased used equipment) and up to approximately

$150,000 or greater.  Dr. Serebruany has direct, personal knowledge that there are only a few

laboratories in the world that have the expertise and equipment necessary to perform all of these

tests.  Dr. Serebruany is personally familiar with most of those laboratories, and with most of the

researchers using such test methods to study platelet science.

     36.    ONSET/OFFSET claimed to have enrolled a total of 123 patients at seven sites in

the United States and one site in the United Kingdom.  ONSET/OFFSET claimed that 43 patients

were tested at one site in the United States, and 40 patients were treated at the sole UK site.  Dr.

Serebruany is personally familiar with the researchers and labs at the primary sites in Baltimore

and Sheffield in the UK.  However, the remaining co-authors listed in ONSET/OFFSET are not

known as platelet researchers.  Most of them appear to be clinicians located in rural areas never

known to have conducted platelet research, and not known to have the equipment or expertise

necessary to perform the kind of platelet function testing described in ONSET/OFFSET.

ONSET/OFFSET did not identify which researchers were associated with the numbered sites.

The multiple co-authors listed in ONSET/OFFSET may have believed that they could have been

listed as co-authors without actually enrolling patients.

     37.    ONSET/OFFSET had a particularly aggressive and unrealistic schedule for blood

draws.  Volunteers had to agree to have blood drawn before receiving the test drug, and then have

blood drawn 30 minutes later, and then at 1, 2, 4, 8, and 24 hours after the first dose, have blood

drawn again on two more visits, and then have blood drawn 8, 24, 48, 120, and 240 hours after

receiving the last dose of study drug.  ONSET/OFFSET described the patients as "predominantly .

. . white men between 41 and 83 years of age." To be eligible for enrollment, the patients had to have histories of ACS.

38.     Dr. Serebruany has direct and personal knowledge of the difficulty in recruiting patients as volunteers in studies that require multiple blood draws. The difficulty in recruiting patients for a study requiring so many blood draws, the expensive and specialized equipment and supplies required to do platelet function testing at the sites, the lack of platelet research experience at the secondary sites listed, and the contradictions between the PLATO mortality data and the platelet data reported in ONSET/OFFSET, all cause Dr. Serebruany to believe that it is more likely than not that ONSET/OFFSET involved fabricated data. When Dr. Serebruany raised concerns to AstraZeneca about the validity of the ONSET/OFFSET data, AstraZeneca responded that it stood behind the data.

## DR. SEREBRUANY HAS REPEATEDLY COMMUNICATED HIS DATA CONCERNS

39.     In October, 2010, Dr. Serebruany communicated his concerns about PLATO study data to the FDA. Dr. Serebruany also published an article specifically calling for verification of the data: Viewpoint: "*Paradoxical Mortality Numbers in the PLATO Trial Should Be Independently Verified.*" Thrombosis & Haemostatis. 2011;105:752-9 (May, 2011). In March of 2011, Dr. Serebruany forwarded this article to the Department of Health and Human Services (HHS), which in turn, sent the article to the FDA Compliance Division. Dr. Serebruany also published an article with co-author Dan Atar questioning the biased selection of cases for adjudication in the PLATO trial: *Clinical adjudication of myocardial infarction in outcome-driven clinical trials: Common patterns in TRITO, RECORD, and PLATO?* Thrombosis & Haemostatis. 2012;108.2 (PMID: 22836596). Dr. Serebruany has since discovered that the FDA has not, to date, undertaken a verification of the vital statistics underpinning the PLATO trial. Because there

has been no independent, comprehensive review of the mortality data in PLATO, and for the reasons stated above, it is highly likely that individuals listed as deceased in the PLATO study were in fact alive at the time, and may be alive now.

## TAXPAYERS ARE PAYING FOR TICAGRELOR/BRILINTA

40.     In July, 2011, the FDA approved AstraZeneca's New Drug Application (NDA) for the drug compound ticagrelor, marketed by AstraZeneca under the brand name Brilinta. Brilinta is an oral medication that inhibits platelet activity. The United States reimburses patients for the costs of prescription drugs under various government programs, including Medicare Part D, Medicaid, and various health plans for current and former military personnel and other categories of government employees. AstraZeneca obtained FDA approval for ticagrelor/Brilinta with fraudulent data. If the FDA had received accurate data, it would not have approved Brilinta for marketing in the United States. Accordingly, every one of the thousands [CAN'T WE SAY MILLIONS?] of claims for reimbursement presented to the United States for reimbursement of Brilinta prescriptions is a false claim, resulting in damages to the United States in the amount of every dollar paid to reimburse for the costs of Brilinta prescriptions.

## COUNT I
### Knowingly Presenting False And Fraudulent Claims For Payment

41.     Plaintiff incorporates all preceding paragraphs.

42.     AstraZeneca knowingly, with actual knowledge, in deliberate ignorance, and in reckless indifference, presented or caused to be presented, false or fraudulent claims to the United States for payment for the costs of Brilinta prescriptions. Each of these claims violated 31 U.S.C. 3729(a)(1)(A).

43.     Because AstraZeneca violated 31 U.S.C. 3729(a)(1)(A), the United States suffered actual damages.

## COUNT II
### Knowingly Making and Using False Records and Statements

44.     Plaintiff incorporates all preceding paragraphs.

45.     As described above, AstraZeneca, in violation of 31 U.S.C. 3729(a)(1)(B), knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the United States Food and Drug Administration to approve the drug compound ticagrelor for marketing and sale to patients in the United States.

46.     Because AstraZeneca violated 31 U.S.C. 3729(a)(1)(B), the United States suffered actual damages.

### PRAYER FOR RELIEF

Plaintiff Victor L. Serebruany, on behalf of the United States, requests that judgment be entered in favor of the United States against Defendant AstraZeneca on each count of the Complaint as follows:

1.     for treble the amount of the United States' damages, plus civil penalties of $11,000 for each false claim;

2.     for all costs of this civil action; and

3.     for prejudgment and postjudgment interest; and

4.     for such other and further relief as the Court deems just and equitable.

Plaintiff Victor L. Serebruany, on his own behalf, requests that an award be made in his favor as follows: 15-30% of the proceeds recovered in this action; an amount for reasonable expenses necessarily incurred by relator in the prosecution of this action; all reasonable attorney's fees and costs; and such other and further relief to which the relator may show himself justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands that this case be tried before a jury.

Respectfully submitted,

ANDREW C. WHITE
Bar No. MD08821
ANDREW G. SLUTKIN
Bar No. 433818
Silverman, Thompson, Slutkin & White, LLC
201 N. Charles St., 26th Floor
Baltimore, MD 21201
(410) 576-2200
awhite@mdattorney.com
Attorneys for Relator Victor L. Serebruany

Dated: September 20, 2012